IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 21, 2015 Session

STATE OF TENNESSEE v. KATHERINE LOUISE HOLMES

Appeal from the Criminal Court for Davidson County
No. 2012A90     Mark J. Fishburn, Judge

_____

No. M2014-00420-CCA-R3-CD – Filed July 13, 2015
_____

The defendant, Katherine Louise Holmes, was convicted of attempted first degree (premeditated) murder, a Class A felony. The trial court imposed a sentence of twenty-two years. On appeal, she argues that the evidence was insufficient to sustain her conviction; that the trial court unduly restricted her cross-examination of a witness; that the trial court erred in revoking her bond; that the trial court erroneously did not permit surrebuttal evidence; and that the trial court improperly enhanced her sentence. Following our review of the briefs, the record, and the applicable law, we affirm the judgment of the trial court.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JOHN EVERETT WILLIAMS, J. delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ. joined.

Joshua L. Brand (on appeal); and Michael Freeman (at trial), Nashville, Tennessee, for the Appellant, Katherine Louise Holmes.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Rob McGuire and Sarah Davis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

# FACTS AND PROCEDURAL HISTORY

This case arose after the defendant, who was in the midst of divorce proceedings, convinced Barry Haslip to shoot her husband, the victim. The victim testified that he filed for divorce in March of 2011 and that the proceedings included custody determinations involving his children with the defendant. The victim and the defendant had contact with each other only through their attorneys, and they were having difficulty reaching a custody arrangement for the children. As part of a temporary custody arrangement, the victim and the defendant would meet at the defendant's apartment complex at 7:30 p.m. on Wednesday evenings and exchange custody. The victim testified that the custody arrangements were to be finalized on September 1, 2011. On August 24, 2011, the victim arrived at the complex with his children around 7:00 p.m. or 7:05 p.m. in a black Pontiac Firebird and waited for the defendant.

While the victim was waiting, the defendant was en route to the apartment complex with Mr. Haslip after picking him up from his workplace at Home Depot. Mr. Haslip had first met the defendant in high school when the two worked together at a restaurant. He developed "a high school crush" on the defendant, but a relationship never blossomed. After losing contact with the defendant, Mr. Haslip encountered her at a drug store in the spring of 2011, and the two exchanged phone numbers. At the time that he saw the defendant, Mr. Haslip was engaged to the mother of his child.

At some point after exchanging phone numbers with the defendant, Mr. Haslip separated from the mother of his child. He again came into contact with the defendant, and he learned that she was in the middle of divorce proceedings with the victim. Seeing the defendant again rekindled his romantic feelings toward her, and he became interested in beginning a romantic relationship with the defendant. Mr. Haslip and the defendant began communicating with each other through text messages and phone calls.

Mr. Haslip admitted that he told the defendant things about himself that were untrue in order to impress her. Mr. Haslip suffered from dyslexia and Attention Deficit Hyperactive Disorder, and he testified that he would lie about his accomplishments in order to impress women and to conceal his disability. He would tell people that he "was a bad guy when [he was] not," and he agreed that he would tell people that he was "a fighter" and "a tough guy." He told the defendant that he owned motorcycles and a truck, but he agreed that he did not own these items and that he could not drive. He admitted that he lied when he told the defendant that he was having his motorcycles repaired.

In May of 2011, the defendant and Mr. Haslip were exchanging text messages nearly every day, including text messages saying, "I love you." In these conversations, the defendant would also complain about the victim and her divorce proceedings. In one

exchange from May 23, 2011, the defendant texted Mr. Haslip, "I'm f*****g shaking so bad I can barely drive or text[;] check my Facebook, [the victim's brother] went off on me." Mr. Haslip replied, "Do you want me to handle him for you baby?" Mr. Haslip testified that he meant the text message to indicate that he would fight anyone whom the defendant needed him to fight. During this same exchange, the defendant also texted him, "Baby, you have never seen me on my knees, I'm begging you, before he corrupts more people I care about against me and fully ruins my life, please, I'll do anything."

During June and July of 2011, the defendant and Mr. Haslip communicated with less frequency. Mr. Haslip also had romantic relationships with several women during this time period. In August of 2011, the defendant and Mr. Haslip began communicating regularly again, although Mr. Haslip ultimately ended up deleting the majority of their August text messages. Mr. Haslip agreed that they regularly discussed becoming a romantic couple.

On August 23, 2011, the defendant picked up Mr. Haslip at his parents' home, and they went to Wal-Mart. After shopping for the defendant's daughter, the two sat in the parking lot and talked. The conversation turned to the defendant's marriage, and she informed Mr. Haslip that her custody battle was going poorly. Mr. Haslip testified that the defendant asked him "to take care of" the victim. Mr. Haslip believed she meant for him to kill the victim. The defendant asked Mr. Haslip if he had a firearm. Mr. Haslip had access to a revolver stored in the attic of his parents' home.

The defendant then drove Mr. Haslip to her apartment complex. Mr. Haslip testified that he did not know that it was her complex at the time and that he had never been to the complex before. The defendant told Mr. Haslip that the victim would be there the next day to exchange custody of their children, giving Mr. Haslip an opportunity to shoot the victim. The defendant explained that the exchange would take place near the apartment clubhouse and that the victim would be "in a small black car." Mr. Haslip was instructed to remain out of sight beside the clubhouse during the exchange. The defendant told Mr. Haslip to wear a black hoodie.

On August 24, 2011, Mr. Haslip went into the attic of his parents' home. He retrieved his grandfather's revolver and loaded it. He went into work at noon with a backpack containing the loaded revolver and a black hoodie. Throughout the day, Mr. Haslip and the defendant were texting each other, and the defendant was using a new "Tracfone," which she had not previously used to contact Mr. Haslip. There were only two contacts in the phone. Contact A contained the victim's phone number, and Contact B contained Mr. Haslip's phone number. Mr. Haslip intended to take his break at 6:00 p.m., at which point the defendant would pick him up at Home Depot and drive him to the apartment complex to shoot the victim. Using the defendant's new phone number,

Mr. Haslip and the defendant had the following text message exchange starting at 6:26 p.m. on August 24:

> Mr. Haslip: I know I dont know what the hell it is, it feel like my first time I did this.
>
> Defendant: Bc it means so damn much and if we fail, we r all so f****d its not even funny. I have total faith in you angel.
>
> Mr. Haslip: I don't know what the f*** it is I just want to get it over.
>
> Defendant: U will when u see me. I've been clinging to the thought of u all day.
>
> Mr. Haslip: I hope so where do you want to meet.
>
> Defendant: Where ever is best for u. I'm stuck n traffic on harding. Trying to get there as quick as possible.
>
> Mr. Haslip: Do you just want to do it late tonight I told you sumething is not right.
>
> Defendant: I won't b able to find him, i dunno where he is staying and cant take my vehicles out. I dont see what other options we have.
>
> Defendant: Almost there, dont give up on me.
>
> Mr. Haslip: Im not.
>
> Defendant: I love you more than anything.

The defendant arrived at Home Depot a little after 7:00 p.m., and Mr. Haslip got into her truck. She drove them to the apartment complex, where Mr. Haslip exited the truck and went behind a dumpster to remove the weapon from his backpack. The defendant drove away, and Mr. Haslip began walking toward the clubhouse. He heard the defendant and the victim talking, and he walked up behind the victim and shot him once in the back of the head.

The victim testified that he did not remember the shooting. He recalled getting out of the black car that he was driving and walking around the office building with his children. He testified that his next memory was "[l]aying in a hospital bed a couple days

4

later with two detectives asking me what I remembered." He did not see the person who shot him, and he testified that he had never met Mr. Haslip or seen him before.

After shooting the defendant, Mr. Haslip ran back to Home Depot, clocked back into work, and finished his shift. Around 2:30 a.m. the next morning, police arrested Mr. Haslip. He was taken to an interview room by two detectives, including Detective Corey Wall. Detective Wall asked Mr. Haslip if he wished to make a statement, and Mr. Haslip began speaking with the detectives. He initially denied any involvement in the shooting, but "less than five minutes" later he admitted that he had shot the victim. He falsely told police several times that the defendant gave him a gun. Mr. Haslip told Detective Wall that the plan to shoot the victim had been formulated on August 23, and he said that he shot the victim at the request of the defendant. Mr. Haslip explained that the shooting was to occur at 7:30 p.m. at the defendant's apartment complex during her custody exchange with the victim. Detective Wall testified that a person could reach Mr. Haslip's workplace on foot from the apartment complex fairly quickly.

After the interview was over, the detectives left the room but left the audio recording of the interview on. Detective Wall testified that the equipment captured Mr. Haslip place his head on the table, begin to cry, and make a statement to himself that he "really screwed up."

Mr. Haslip testified that the defendant asked him to murder the victim. He testified that the defendant told him when and where the shooting was to take place and that she transported him to this location. He stated that the defendant told him where to position himself to shoot the victim and what to wear during the shooting. He explained that he agreed to shoot the victim because he "cared for [the defendant] and [he] thought she loved [him]." Mr. Haslip testified that the defendant never expressed concern about her ability to pay for the divorce and that he never indicated that he would be able to assist her financially with the divorce. Mr. Haslip admitted that he lied to police when he initially told them that the defendant gave him the gun.

**Defense Proof**

Jeanette Heiman, the defendant's best friend, and Ronnie Hampton, a classmate, each testified that on August 23, 2011, the defendant called them and asked them to accompany her to a custody exchange the next day. Neither Ms. Heiman nor Mr. Hampton was able to attend the exchange. Ms. Heiman testified that she had not ever accompanied the defendant to custody exchanges, and Mr. Hampton testified that he did not spend time with the defendant outside of class or socialize with her.

Sharon Wiles, the defendant's mother, testified that on August 24, 2011, she "received a hysterical phone call" from the defendant. The defendant said that the victim had been shot and asked Ms. Wiles to come pick up her children. When Ms. Wiles arrived at the crime scene, she observed that both the defendant and her children were upset and crying. She testified that the defendant had never asked her to attend a custody exchange with the victim.

Ms. Wiles testified that she was aware that William Pierce and the defendant were in a dating relationship and that the two moved in together in the spring or summer of 2011. She stated that the defendant informed her the day after the shooting that Mr. Haslip had shot the defendant. The defendant told Ms. Wiles that she was placing her children in her truck "when Mr. Haslip walked up behind [the victim] and shot him." Ms. Wiles testified that the defendant told her that she had taken Mr. Haslip to the apartment complex. Ms. Wiles stated that the defendant described Mr. Haslip as "a friend" and not as a person that she loved or cared about.

Carissa Klausner testified that she had moved into the apartment complex the day that the victim was shot. She was attempting to find the complex office when she heard a gunshot. She saw a person in a hoodie running away from where the shooting occurred, and she saw the defendant with her children. Ms. Klausner testified that everyone, including the defendant, "was just freaking out." She saw the defendant shout for someone to call 911, and in Ms. Klausner's opinion, the defendant appeared to be crying and upset.

Ms. Klausner testified that she did not recall telling police officers that the person in the hoodie was a white male. She agreed that she likely made the statement if a report indicated that she did. She also agreed that it was possible that the defendant was feigning her hysterics at the scene but stated that her trauma appeared to be genuine.

The defendant testified that both she and the victim customarily brought witnesses to their custody exchanges. She usually would bring her boyfriend William Pierce to the exchanges. She testified that when she learned that Mr. Pierce might not be available to attend the August 24, 2011 exchange she contacted "several backups," including Mr. Haslip.

She testified that Mr. Haslip had been a friend for over ten years but that she "didn't care for him the way that he wanted [her] to." She stated that she told Mr. Haslip about her divorce and that her primary concern was the financial ramifications of the divorce. She testified that in March of 2011, Mr. Haslip offered to pay the costs of her divorce if she would leave Mr. Pierce and marry him. The defendant agreed that she

6

"kind of le[]d [Mr. Haslip] on" during the summer of 2011. She testified that she did so in hopes that he would help pay for her divorce.

The defendant testified that Mr. Haslip told her several things about himself that were grossly exaggerated. She stated that Mr. Haslip told her that he was a member of "the Outlaws motorcycle gang" and that he had two motorcycles and a truck. He told her that one of the motorcycles was having the gas tank repainted to remove the Outlaws' logo, and that he was awaiting a specially-ordered tire for the second. He informed the defendant that his truck had been "shot up." He told the defendant that he made a substantial profit from completing a weapons deal selling grenade launchers in Clarksville. Mr. Haslip represented that after the deal, he had "decided to go legit," which was the reason he removed the Outlaws sticker from his bike. He told the defendant that he worked in loss prevention in Home Depot and that he was sent to a federal facility in Texas for training. The trainers were "highly impressed" with Mr. Haslip's skills with firearms and weapons and wished to make him a federal bounty hunter. The defendant testified that Mr. Haslip "alluded to working undercover with the government and having ties to the FBI and CIA, things of that nature." The defendant testified that Mr. Haslip would "constantly threaten to hurt people." She agreed that she did not believe everything that Mr. Haslip told her.

She testified that she was with Mr. Haslip on August 23, 2011, at her apartment complex. Mr. Haslip told her that he had visited the apartment complex numerous times and had several friends that lived there. The two sat and talked by the pool, and the defendant could not recall if Mr. Haslip offered to "handle" anyone for her that evening.

She testified Mr. Haslip told her that the mother of his child lived in the defendant's apartment complex. She stated that one of the reasons that Mr. Haslip wished to accompany her to the apartment complex was so that he could break up with the mother of his child. She testified that on August 24, she picked up Mr. Haslip from Home Depot and drove to the apartment complex. Once they arrived, Mr. Haslip instructed her to drop him off so that he could go speak with the mother of his child. The defendant continued on to the office of the complex, where she saw the victim and her children. She parked next to the victim, and Mr. Haslip was not present at the time. The defendant assumed Mr. Haslip was not finished speaking with his girlfriend, and she began the custody exchange without him.

The defendant testified that after she placed her two children in her truck, the victim approached her and started to speak to her. The defendant stopped the conversation and turned her back to the victim. As she turned, she saw a person in a black hoodie with one hand in their pocket walking down the sidewalk. She testified that she could not see the person's face because their head was down and their hood was up.

7

She did not find it odd that someone was wearing a hoodie in August. The defendant did not pay the person any attention and began to enter her vehicle. She then heard a gunshot and saw that the victim had been shot. She began "screaming for someone to call 911."

The defendant testified that she had never discussed shooting or killing the victim with Mr. Haslip. When she complained about the divorce proceedings, Mr. Haslip would ask, "You want me to take care of it? I'll take care of it for you." The defendant believed that Mr. Haslip would never actually harm the victim. She could not recall giving any indication that she wanted the victim dead. She testified that there was not a custody hearing scheduled for September 1, 2011. She agreed that she told detectives that on the previous evening she and Mr. Haslip had discussed killing the victim, but she believed that it was simply "another one of [Mr. Haslip's] boasts." When cross-examined about several of her other statements to police, the defendant testified that she could not recall making them.

### State's Rebuttal Proof

Jessie Ray Akers, Jr., testified that he represented the victim during his divorce proceedings. He testified that a hearing regarding a temporary parenting plan for the victim and the defendant was scheduled for September 1, 2011. Mr. Akers explained that he believed with certainty that the hearing would have resulted in negative consequences for the defendant's custody of her children.

Detective Wall testified that he executed a subpoena for all of the phone records for the defendant's Tracfone and that the records he had were all that he received. The State also introduced several portions of the defendant's statements to police that she testified during cross-examination that she did not recall.

At the close of the State's rebuttal proof, the defendant did not wish to offer any surrebuttal proof. The next day, prior to closing arguments, the defendant made a motion to re-open the proof to allow the jury to view the tape of her interview with police in its entirety. Prior to trial, the defendant had filed a motion to suppress her statements to the police, which the trial court granted in part. In arguing for the admissibility of the entire statement, the defense argued that the segments of the video played by the State could have been taken out of context. The defendant requested that she either be permitted to play the statement in its entirety or be allowed to return to the stand to clarify and to explain these statements. The trial court denied the motion, finding that the defendant received an opportunity to admit, deny, or explain her statements on cross-examination. The court also found that because it had suppressed the statement that it could not be used for substantive evidence. The case was submitted to the jury, and the jury convicted the defendant of attempted first degree murder.

At the sentencing hearing, Ms. Wiles and Ms. Heyman[1] testified on the defendant's behalf. The trial court considered the purposes and principles of the Sentencing Act when sentencing the defendant. The court found that enhancement factor two, that the defendant was a leader in the commission of an offense involving two or more criminal actors, applied because the shooting would not have occurred but for the defendant's manipulation of Mr. Haslip. The court found that the defendant intentionally used Mr. Haslip on the evening of the incident to shoot the victim and that "she planned wholeheartedly and solely the attempt to have her husband killed." The court found that enhancement factor nine, that the defendant used a firearm during the commission of a dangerous felony, applied because the defendant was well aware that Mr. Haslip had a gun on the evening of the shooting and that he intended to use it to shoot the victim. The court found that enhancement factor three, more than one victim, applied because the defendant's children were not named in the indictment but were "clearly within" the range of danger. The court found that the children were also at risk of "significant psychological and emotional damage" that could rise to the level of serious bodily injury. The court found that no mitigating factors applied. The trial court imposed a sentence of twenty-two years.

## ANALYSIS

On appeal, the defendant argues that the evidence is insufficient to support her conviction; that the trial court erred in refusing to allow the defendant to impeach Mr. Haslip with specific instances of prior conduct on cross-examination; that the trial court erred in revoking the defendant's bond; that the trial court erred in prohibiting the defendant from introducing her recorded police interview; and that the trial court erred in imposing a twenty-two-year sentence.

### I. Sufficiency of the Evidence

The defendant contends that the evidence was insufficient to support her conviction for attempted first degree murder. Specifically, she argues that there was no proof that she possessed the requisite intent to commit first degree murder.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal,

---

[1] The sentencing hearing transcript spelled the witness's name as "Heyman," but the trial transcript spelled it "Heiman."

9

"'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

A person is guilty of criminal attempt "who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense T.C.A. § 39-12-101(a)(3) (2010). Tennessee Code Annotated section 39-13-202(a)(1) defines first degree murder as "[a] premeditated and intentional killing of another." "'[P]remeditation' is an act done after the exercise of reflection and judgment," and it requires the formation of the intent to kill "prior to the act itself." T.C.A. § 39-13-202(d). The intent to kill need not have preexisted "in the mind of the accused for any definite period of time." *Id.* "The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

Premeditation presents a question of fact to be resolved by the jury, and it may "be inferred from circumstantial evidence surrounding the crime." *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013) (citations omitted). Circumstances supporting a finding of premeditation include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997) (citations omitted).

A defendant may be found guilty under a theory of criminal liability. Criminal liability is not a wholly distinct crime, but it is "a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another

10

person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). The defendant may be criminally responsible for the conduct of Mr. Haslip if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the [defendant] solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2).

Viewing the evidence in the light most favorable to the State, the defendant and Mr. Haslip had a conversation about killing the victim. This discussion occurred less than two weeks before a scheduled hearing to impose a temporary parenting plan regarding custody of the defendant's and the victim's children. Mr. Haslip testified that on the day before the shooting the victim informed him that her custody battle was not going well, and Mr. Akers testified that the temporary parenting plan was almost certain to be unfavorable for the defendant. The defendant asked Mr. Haslip if he had a gun. She drove the defendant to the apartment complex and identified where and when the shooting should take place. She told him what to wear and where to position himself to shoot the victim. She also described the car that the victim would be driving so that Mr. Haslip could identify the person that he was supposed to shoot. When Mr. Haslip expressed reservation about the shooting and wanted to delay it, the defendant said that it had to occur as scheduled because she did not know where the victim would be later and she would not have access to him. It was within the province of the jury to reject the defendant's claim that Mr. Haslip misconstrued their conversation about "taking care" of the victim. We conclude that the evidence is more than sufficient to support the defendant's conviction for attempted first degree murder. The defendant is not entitled to any relief.

## II. Impeachment of Mr. Haslip

The defendant argues that the trial court erred in preventing her from impeaching Mr. Haslip on cross-examination. Specifically, she contends that the trial court incorrectly applied Tennessee Rule of Evidence 608 and that any error in restricting cross-examination was not harmless because Mr. Haslip's credibility "was perhaps the single key issue in the case."

The defendant wished to cross-examine Mr. Haslip regarding statements that he made that he was a member of a motorcycle gang, a member of law enforcement, and that he participated in stake-outs and specialized training missions. The trial court held a hearing outside the presence of the jury, and Mr. Haslip testified that he never informed anyone that he was a member of a motorcycle gang or that he had an Outlaws club logo removed from his motorcycle gas tank. He testified that he never claimed to be a member of law enforcement and never claimed that that he participated in stakeouts, undercover missions, or specialized training missions. He testified that he "put up a

11

cover on a lot of things because of [his] disability" in order to conceal his disabilities from others. Defense counsel questioned Mr. Haslip about several specific text messages where he referenced "getting new orders" from his "Lt," participating in something where he was "putting [his] life on the line," and "going to be on a stake-out for two nights." Mr. Haslip testified that his supervisor at Home Depot tended to communicate using military terms and that his supervisor would refer to tasks in the store as "missions." He also testified that his supervisor was a former lieutenant in the Army.

The trial court ruled that it would not permit the cross-examination. The court found that the evidence had "little, if any, probative value." The court also found that the probative value did not substantially outweigh the prejudicial effect. At the motion for new trial, the defendant introduced an affidavit from Steven Lowell. Mr. Lowell stated that he heard Mr. Haslip make "numerous claims" that he was a Special Forces Agent, handled guns and participated in espionage activities, and he testified that Mr. Haslip insinuated that he had killed people in the past. Mr. Lowell also attested that he did not believe these claims. The trial court found that it should have permitted the defendant to cross-examine Mr. Haslip about his misrepresentations but that the error was harmless.

The Sixth Amendment to the United States Constitution affords a defendant the right to confront adverse witnesses. U.S. Const. amend. VI; *see also* Tenn. Const. art. I, § 9. This includes "the right to establish bias or to otherwise impeach the credibility of a witness." *State v. Echols*, 382 S.W.3d 266, 284-85 (Tenn. 2012). The trial court possesses discretion over the propriety, scope, manner, and control of the examination of a witness. *State v. Harris*, 839 S.W.2d 54, 72 (Tenn. 1992). The trial court abuses this discretion only "by unreasonably restricting a defendant's right to cross-examine a witness against him." *Echols*, 382 S.W.3d at 285. If the defendant is denied his right to carry out an effective cross-examination, the error must be found harmless beyond a reasonable doubt. *Id*.

Tennessee Rule of Evidence 608 governs the attack of a witness's character for truthfulness or untruthfulness. Specific instances of conduct that are "probative of truthfulness or untruthfulness" may be the subject of cross-examination if certain conditions are met. Tenn. R. Evid. 608(b). First, the trial court must hold a jury-out hearing and "must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." Tenn. R. Evid. 608(b)(1). The trial court must only determine that the probative value of the evidence substantially outweighs the prejudicial effect if the conduct occurred more than ten years prior to the trial. Tenn. R. Evid. 608(b)(2). "Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence." Tenn. R. Evid. 608(b).

In ruling that the probative value had to substantially outweigh the danger of unfair prejudice, the trial court applied an incorrect legal standard.[2] However, even if the trial court committed error when it limited cross-examination, the error was harmless. The issue of Mr. Haslip's misrepresentations was sufficiently before the jury. On direct examination, Mr. Haslip testified that he would lie about his exploits, particularly to women whom he wished to impress, in order to cover up his disabilities. He agreed that he lied to the defendant in order to impress her. He agreed that he wanted the defendant to believe that he owned a motorcycle when he did not. On cross-examination, he testified that he would tell people that he was "a bad guy when he wasn't," and he agreed that he misrepresented himself as a "fighter" and a "tough guy." He was also asked on cross-examination about his motorcycles, and he admitted that he lied when he told the defendant that they were being repaired. The defendant also placed Mr. Haslip's credibility before the jury with her testimony. She testified that Mr. Haslip told her that he was a member of the Outlaws gang, that he brokered weapons deals, and that he received special government training as a bounty hunter. She stated that she did not believe the majority of these claims. The jury was made aware that Mr. Haslip was untruthful at times, and the restriction of cross-examination did not deprive the defendant of her right to a fair trial.

The defendant concedes that the issue of whether extrinsic evidence of Mr. Haslip's conduct may have been admissible pursuant to Rule 613 was not specifically raised at trial. There was no objection made under Rule 613, and the defendant did not attempt to present the testimony of Mr. Lowell. Accordingly, this issue is waived. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

### III. Bond Revocation

The defendant argues that the trial court erred in revoking her bond the evening prior to her testimony. She contends that the conditions of her subsequent confinement substantially impacted her ability to testify in her own defense the following day.

Tennessee Code Annotated section 40-11-141(a) provides that "[a] defendant released before trial shall continue on release during trial" unless the trial court determines that other conditions are necessary to ensure the defendant's appearance at trial or to ensure that the defendant will not prevent the progression of the trial.

---

[2] In *State v. Morgan*, 541 S.W.2d 385 (Tenn. 1976), our supreme court held that when a party seeks to cross-examine a witness about specific instances of conduct pursuant to Rule 608(b), the court must determine "that the probative value of such evidence outweighs its prejudicial effect." *Id.* at 390.

However, if the defendant violates a condition of release, the trial court may revoke the defendant's bond and order the defendant to be held without bail or release during the pendency of the trial. T.C.A. § 40-11-141(b). The proper method of challenging a bond revocation is to file a written motion for review in the trial court. Tenn. R. App. P. 8(a); *see State v. Melson*, 638 S.W.2d 342, 358 (Tenn. 1982). If a defendant fails to comply with the procedures of Tennessee Rule of Appellate Procedure 8, the issue of a bond revocation is waived on appeal. *State v. Melvin J. Branham*, No. E2013-00638-CCA-R3-CD, 2014 WL 869552, at *6 (Tenn. Crim. App. Mar. 4, 2014), *perm. app. denied* (Tenn. Sept. 24, 2014); *State v. Joshua Meeks*, No. M2008-00556-CCA-R3-CD, 2009 WL 1748927, at *10 (Tenn. Crim. App. June 22, 2009). The record reflects that the defendant filed no written motion contesting the revocation of bond. Accordingly, we conclude that the defendant has waived this issue, and she is not entitled to relief.

### IV. Defendant's Recorded Statement

The defendant argues that the trial court erred by prohibiting her from introducing her recorded statement to police into evidence during surrebuttal and refusing to let her retake the stand to clarify the portions of her statements introduced during the State's rebuttal. She contends the trial court should have permitted her to waive her right against self-incrimination and introduce the statement.

The trial court possesses the sound discretion to determining whether to reopen the proof for the presentation of additional evidence. *Simpson v. Frontier Community Credit Union*, 810 S.W.2d 147, 149 (Tenn. 1991). The trial court's decision "will not be set aside unless there is a showing that an injustice has been done." *State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985). "Further, unless the evidence sought to be introduced on a motion to reopen proof is such as would show a different result would probably occur, the action of the trial judge in refusing to reopen the proof will not be set aside." *Id.*

The trial court also has discretion regarding the admission of rebuttal and surrebuttal evidence, and this court will not reverse the decision of the trial court absent an abuse of discretion. *State v. Thompson*, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000). Rebuttal evidence is "[a]ny competent evidence which explains or is a direct reply to or a contradiction of material evidence introduced by the accused." *Nease v. State*, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979). After the defendant's proof, the State is entitled to present rebuttal evidence because it "does not and cannot know what evidence the defense will use until it is presented at trial." *State v. Cyrus Deville Wilson*, No. 01C01-9408-CR-266, 1995 WL 676398, at *9 (Tenn. Crim. App. Nov. 15, 1995) (quoting *State v. Williams*, 445 So.2d 1171, 1181 (La. 1984)). After the State's rebuttal, the defendant is "entitled to present surrebuttal evidence to explain, contradict, or directly

reply to the [S]tate's rebuttal evidence." *State v. Thompson*, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000).

The defendant has not established that an injustice occurred with the trial court's decision not to reopen the proof. The State intended to introduce the entire statement during its case-in-chief until it was partially suppressed. Even without the statement, there was sufficient evidence of the defendant's guilt. The defendant fails to show how the introduction of the statement would have led to a different result in the trial. Further, on cross-examination, the defendant received the same opportunity that she sought on surrebuttal to explain her statements to police. The defendant fails to explain why she was unable to explain her statements after she reviewed them on cross-examination but would have been able to do so after they were introduced as rebuttal evidence. Accordingly, we conclude that the trial court did not abuse its discretion in denying the defendant's request to reopen the proof and present surrebuttal evidence. The defendant is not entitled to any relief.

## V. Sentencing

The defendant argues that the trial court erred in imposing a twenty-two year sentence. Specifically, she claims that the trial court misapplied enhancement factors three and nine. This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. The misapplication of an enhancement or mitigating factor by the trial court "does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing as provided by statute." *Id.*

After the trial court establishes the appropriate range of the sentence, the court must consider the following factors to determine the specific length of the sentence: (1) the evidence, if any, received at trial and at the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the

defendant wishes to make in his own behalf about sentencing.  T.C.A. § 40-35-210(a), (b)(1)-(7).

The defendant contends that her children did not qualify as "victims" for the purpose of enhancement factor three.  Our Supreme Court has held that enhancement factor three is not applicable when there is one offense committed against a specific, named victim.  *State v. Imfeld*, 70 S.W.3d 698, 706 (Tenn. 2000).  "A victim is 'a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime.'"  *State v. Cowan*, 46 S.W.3d 227, 235 (Tenn. Crim. App. 2000) (quoting *State v. Raines*, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994)).  This definition does not include "[t]he psychological injuries suffered by relatives witnessing an attack on the actual victim."  *State v. Alexander*, 957 S.W.2d 1, 6 (Tenn. Crim. App. 1997).  While we agree with the trial court that the children were certainly within the "range of danger" and can only imagine the horror that accompanies the sight of a parent being shot, the children were not injured and did not have property stolen or destroyed.  The fact that the offense was committed in the presence of the children is not sufficient to warrant the application of the enhancement factor.  *Imfeld*, 70 S.W.3d at 706.  Therefore, we conclude that the trial court erroneously applied enhancement factor three.

However, the misapplication of an enhancement factor will not void a sentence unless the trial court "wholly departed from the 1989 Act, as amended in 2005."  *Bise*, 380 S.W.3d at 706.  The record reflects that the trial court properly found that several other enhancement factors, including enhancement factor nine, were applicable.  Although the defendant did not physically possess the weapon, she was able to exercise control over the weapon through Mr. Haslip.  He acquired his grandfather's revolver at the defendant's request.  She told him where and when the shooting would occur and drove him to the apartment complex knowing that he possessed a gun to shoot the victim.  The trial court considered the purposes and principles of the Sentencing Act when imposing the sentence and imposed a within-range sentence of twenty-two years.  We conclude that the trial court did not abuse its discretion in sentencing the defendant.  She is not entitled to any relief.

## CONCLUSION

Based upon the foregoing, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

16